IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Car Charging Group, Inc., a Nevada Corporation and 350 Holdings, LLC, a Florida limited liability company, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) ) ) | Nos. 13 C 3124 13 C 4020 |
| JNS Holding Corporation, a Delaware Corporation, and JNS Power & Control Systems, Inc., an Illinois Corporation, | ) ) ) ) ) | |
| | ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| JNS Power & Control Systems, Inc., an Illinois Corporation, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| 350 Green, LLC, a Virginia limited liability company, | ) ) ) | |
| Defendant | ) | |

MEMORANDUM OPINION AND ORDER

These consolidated cases arise out of a dispute between Car
Charging Group, Inc., and 350 Holdings, LLC, on the one hand
(collectively, "CCGI"), and JNS Holding Corporation and JNS Power
& Control (collectively, "JNS") on the other, over the ownership
of certain assets previously owned by 350 Green, LLC. Each side

contends that 350 Green entered into a valid and enforceable agreement to transfer the assets in question to it, with CCGI pointing to an equity exchange agreement dated March 8, 2013 (the "Exchange Agreement"), and its subsequent addenda, and JNS asserting an asset purchase agreement dated April 17, 2013 (the "APA").

Before me are cross-motions for partial summary judgment. In its motion, JNS seeks summary judgment of its claim against 350 Green for specific performance of the APA. CCGI seeks summary judgment of its claim for a declaratory judgment that the APA is void as a matter of law. For the reasons that follow, I grant JNS's motion and deny CCGI's.

I.

The entities embroiled in this dispute are all service providers for electric vehicle charging stations. In October of 2010, 350 Green, LLC, was awarded a City of Chicago grant for $1,911,000 to install a network of electric car charging stations in the Chicago Area (the "Chicago Project"). On June 14, 2012, the City of Chicago sent 350 Green a Notice of Default on the agreement governing the Chicago Project. Shortly thereafter, 350 Green and its Members, Mariana Gerzanych and Timothy Mason (the "350 Members") began negotiating with Car Charging Group, Inc. ("CCGI") for the sale of all of their membership interests in 350 Green to a newly-formed subsidiary of CCGI (later named "350

2

Holdings"). 350 Green retained Oracle Capital Securities to assist in the sale. Negotiations proceeded pursuant to two separate term sheets, signed in July and August of 2012, while CCGI conducted due diligence.

These negotiations culminated in the execution, on March 8, 2013, of the Exchange Agreement among CCGI, 350 Holdings, 350 Green, and the 350 Members. Pursuant to the Exchange Agreement, CCGI agreed to issue shares in CCGI stock to the 350 Members in exchange for the 350 Members' transfer to 350 Holdings of all of their membership interests in 350 Green. The Exchange Agreement provides that the transaction was to close after certain preconditions were met or waived and "no later than ten (10) business days after the Effective Date" of the agreement, or March 22, 2013.

As far as the record reveals, the deal was on track to close until March 21, 2013. On that date, counsel for 350 Green and the 350 Members sent fully executed closing documents to in-house counsel for CCGI. Counsel for CCGI confirmed receipt of these documents but indicated that she was "not yet authorized" to circulate CCGI's executed closing documents, emphasizing that the deal was "not yet closed." Counsel for 350 Green informed CCGI's counsel at that point that if the deal were not closed by the following day—the closing deadline provided in the Exchange Agreement—his clients would consider the transaction to be

expired. JNS's L.R. 56.1 Stmt., Exh. 6 at ¶ 5.[1] The next day—the closing deadline provided in the Exchange Agreement—CCGI's counsel sent 350 Green and the 350 Members a non-compete agreement along with an "addendum" to extend the closing date until the following Monday (March 25, 2013). Counsel for CCGI stated, "[w]e need both documents signed and returned before I will circulate [CCGI's CEO's] signature pages." JNS's L.R. 56.1 Stmt., Exh 9 at 1 [DN 35].

---

[1] Although the parties did not make the task easy, I am satisfied based on careful review of the record in both cases that this fact is undisputed. JNS states this fact in ¶ 22 of its Statement of Additional Undisputed Facts ("SAF") filed in opposition to CCGI's motion in the 13 C 3124 case [3124 DN 48], citing the "Pierce Aff." and the "Gerzanych Aff." without any reference to where, if anywhere, such exhibits may be found in the record. As far as I can discern, the only affidavit of Mariana Gerzanych in this record is the one CCGI attached as an exhibit to its own Statement of Additional Undisputed Facts in opposition to JNS's motion in the 13 C 4020 case [4020 DN 37-13]. Unsurprisingly, nothing in that affidavit supports JNS's assertion. While there is no "Pierce Aff." attached to JNS's SAF in the 3124 case (i.e., where the affidavit is cited), I assume JNS is referring to the Affidavit of John Pierce attached to JNS's L.R. 56.1 statement in support of its motion in the 4020 case, which does, indeed, support the fact JNS asserts at ¶ 22 of its SAF in the 3124 case. JNS should have facilitated my review by ensuring that all evidence cited in its factual statement is, in fact, in the record, and by indicating clearly, by reference to an exhibit number, where that evidence can be found. Nevertheless, I am satisfied that this particular fact does, indeed, find support in the consolidated record. I am likewise satisfied that the fact is undisputed, since CCGI failed to respond to JNS's SAF in the 3124 case. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004); L.R. 56.1(a) ("All material facts set forth in the statement filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party."). Moreover, none of CCGI's own factual statements meaningfully controverts the statement in the Pierce Affidavit.

The remainder of the day came and went with no response from 350 Green or the 350 Members. By the following Monday, March 25, the 350 Members were describing the deal as "terminated," *see* 3/25/2013 email of Tim Mason to Brian Howe, JNS's L.R. 56.1 Stmt., Exh. 11 [4020 DN 35], and "cancelled." *See* 3/25/2013 email of Mariana Gerzanych to Craig Sultan et al., Farkas Decl., Exh. J at 92 [3124 DN 41-4]. Neither the non-compete nor the addendum was ever executed by 350 Green or its Members. But on Tuesday, March 26, with no further mention of these documents, CCGI's in-house counsel sent 350 Green and the 350 Members "the signature pages from CCGI necessary to close the acquisition of 350 Green by CCGI," pursuant to the Exchange Agreement.

The ensuing days saw an exchange of emails among the parties, in which they discussed possible terms for an amended agreement, but none was reached. Finally, on April 9, 2013, CCGI and 350 Holdings filed an action in the Southern District of New York, seeking, among other things, to compel 350 Green and the 350 Members to close the transaction pursuant to the Exchange Agreement.

By then, however, 350 Green and the 350 Members were pursuing other opportunities, specifically 350 Green's sale to JNS of the "Chicago Assets," i.e., the 219 electric car chargers (168 of which were already installed, and 51 of which remained to be installed) that were part of the Chicago Project. 350 Green

and its Members reached an agreement with JNS on April 17, 2013, which they memorialized in the Asset Purchase Agreement (the "APA") of that date. Among the representations 350 Green made in the APA were that 350 Green had "the necessary power, authority, and capacity to enter into" the APA; that 350 Green was "the sole lawful owner of the [Chicago] Asset"; that 350 Green was not "in material default under any contract, lease or any other commitment whatsoever" that was likely to affect JNS adversely; and that 350 Green had "terminated all other prospective term sheets or proposals with any other entity, for the purchase of" the Chicago Assets. APA, JNS Cmplt., Exh. B, §§ 1.1, 1.2, 3.9(i), 3.9(ii).

The APA contemplated that the deal would close in two stages: first, upon signing the APA, which occurred on April 17, 2013; and second, when the contingencies set forth in the APA were satisfied on or about April 11, 2013. *Id.*, § 2.12. The only contingency JNS was required to fulfill was to obtain the City of Chicago's acceptance of the terms and conditions set forth in the APA, including the assignment of the remaining benefits and obligations associated with the Chicago Project

grant.[2]   JNS obtained the City of Chicago's acceptance of the terms and conditions of the APA on April 30, 2013.

Between the time the APA was executed and the time JNS fulfilled this contingency for closing, however, CCGI and 350 Holdings settled their claims against 350 Green and the 350 Members in the New York action on April 22, 2013, when they signed an Addendum to the Equity Exchange Agreement (the "First Addendum").[3]   The First Addendum amended the Exchange Agreement's March 22 closing date to April 22, 2013, and it also provided that the 350 Members would receive cash consideration, in addition to shares of CCGI stock, in exchange for their membership interests in 350 Green.   As a condition for closing under the First Addendum, the 350 Members were required to sign, and did sign, an Exclusive Right of First Refusal Agreement. That agreement gave CCGI the right of first refusal to match the terms of any electric vehicle related business opportunities presented to the 350 Members for a twelve-month period beginning on April 22, 2013.

---

[2] CCGI fails to respond to this fact, asserted in paragraph 13 of JNS's L.R. 56.1 Statement, so I deem it admitted.   *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (L.R. 56.1(b) "provides that '[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.'")
[3] The same parties later entered into a "Second Addendum" on April 29, 2013, but nothing about the Second Addendum is relevant to my analysis here.

The First Addendum also provides that the audit of 350 Green
set forth in Section 2.9.1 of the Exchange Agreement

> shall officially commence on the Closing Date [of the
> First Addendum, i.e., April 22, 2013]. At the end of
> seventy-one (71) days [i.e., July 2, 2013], if the
> Audit has not been completed, the Exchange Agreement
> and this Exchange Addendum shall effectively terminate
> without notice and without the necessity for the
> Parties hereto to execute any further documentation to
> effectuate such termination, and all representations,
> warranties and covenants contained therein shall be
> cancelled in full.

First Addendum, § 4. It is undisputed that the audit referenced
in this provision was not completed.

## II.

Summary judgment is proper if "the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." *Citadel Group Ltd. v.
Washington Regional Medical Center*, 692 F.3d 580, 587 (7th Cir.
2012) (quoting Fed.R.Civ.P. 56(a)). I must "construe all facts
and reasonable inferences in the light most favorable to the non-
moving party." *Id.* Contract interpretation is ordinarily a
matter of law, and if the terms of the contract are unambiguous,
"there is no resort to extrinsic evidence, hence no factual
dispute to preclude summary judgment." *International Union v. ZF
Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011) (internal
quotation marks and citation omitted).

Although both parties seek judgments relating to the validity of the Asset Purchase Agreement, their arguments focus at least as heavily on the proper construction of the Exchange Agreement, which they agree is unambiguous. CCGI insists that the terms of the Exchange Agreement prevented 350 Green from entering into a valid agreement to transfer the Chicago Assets to JNS, and that 350 was bound by the Exchange Agreement at the time it executed the APA. CCGI further argues that because JNS had knowledge of the Exchange Agreement, it was likewise unable to execute a valid agreement to purchase the Chicago Assets from 350 Green. For these reasons, CCGI argues, the APA is void as a matter of law.

CCGI's arguments are flawed from the start because the Exchange Agreement plainly does not bar 350 Green from agreeing to sell the Chicago Assets. Accordingly, even assuming that 350 Green and the 350 Members were bound to the Exchange Agreement at the time they entered into the APA (an issue I nevertheless address below for the sake of completion), nothing in that agreement prevented them from consummating the transaction embodied in the APA.

The Exchange Agreement contemplates the sale, via a stock-for-membership interest exchange, of the 350 Green entity. The result of this type of transaction—an "entity sale"—is that post-closing, the buyer (in this case, 350 Holdings) owns the

membership interests in the purchased entity (350 Green), while the entity continues to own its assets. The APA, by contrast, contemplates the sale of certain of 350 Green's assets to JNS. The result of this type of transaction—an "asset sale"—is that the purchaser (JNS) takes ownership of certain of the seller's assets, with no change in ownership of the selling entity (350 Green).[4]

CCGI attempts to gloss over this distinction, insisting that "[t]he Exchange Agreement specifically contemplated the assets related to the Chicago Project as part of the price that 350 Holdings would pay for the membership interests of the 350 Members." Farkas Decl., ¶ 16 [3124 DN 41-3 at 5]. Notable for its absence, however, is a citation to any provision of the Exchange Agreement—the only evidence to which I may look in ascertaining its scope—to support this construction.[5]

CCGI insists, in its reply, that the purchase of 350 Green "includes" 1) third party contracts for work done on the Chicago Project (citing Schedule 2.6 of the Exchange Agreement); 2)

---

[4] These are basic corporate principles that are not genuinely in dispute, but to the extent further discussion of this distinction is helpful, see *Selling Your Business: Entity Sale vs. Asset Sale*, http://www.allbusiness.com/print/3881519-1-9a0bs.html. Exh. A to JNS's Resp. [3124 DN 47].

[5] CCGI points only to the Declaration of Michael Farkas to support this statement. I agree with JNS, however, that Farkas' interpretation of what the Exchange Agreement contemplates is inadmissible, as the parties agree that the terms of the agreement, which includes an integration clause, are unambiguous. *See Duval Motors Co. v. Rogers*, 73 So. 3d 261, 265 (Fla. App. Ct. 2011).

liabilities connected to the Chicago Project (citing Schedule 2.5); and 3) "the chargers themselves" (citing Schedule 2.9)." CCGI's SJ Reply at 2-3 [3124 DN 53]. But if any of the line items in any of these schedules (which together amount to thirty-one pages of generically identified items) corresponds to assets or liabilities relating to the Chicago Project, CCGI has not directed me to them. As the Seventh Circuit's oft-cited observation goes, "[j]udges are not like pigs, hunting for truffles buried in [the record]." *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) (second alteration in original). Schedule 2.9, for example, is nothing more than a year-and-a-half's worth of 350 Green's financial statements, which identify income, expenses, assets, and liabilities using such cryptic labels as "Sales – Product 1," "Independent Contractor," "Electric Installation," and "Accounts Payable." Whether any of these items relates to the Chicago Project is anyone's guess.

In any event, even without CCGI's guidance, I can glean from the face of the Exchange Agreement that CCGI's reliance on these schedules is misplaced. Regardless of what the line items in the cited schedules refer to, none of the Exchange Agreement's substantive provisions restricts 350 Green or the 350 Members from selling any item on any schedule. So even assuming, for example, that one or more of the "Electric Installations" in

11

Schedule 2.9 is among the Chicago Assets, the only reference to Schedule 2.9 in the Exchange Agreement is in § 2.9, which does not prevent 350 Green or the 350 Members from selling or otherwise disposing of these assets. It merely states:

> Attached hereto as <u>Schedule 2.9</u> are 350's unaudited financial statements as of and for the fiscal quarters ended September 30, 2011, December 31, 2011, and September 30, 2012, December 31, 2012 and March 5, 2013 (including balance sheet, income statement; collectively, the "**350 Financial Statements**"). The 350 Financial Statements have not been prepared in accordance with generally accepted accounting principles applicable in the United States of America ("**U.S. GAAP**").

Exchange Agreement, JNS's L.R. 56.1 Stmt., Exh. 1 at § 2.9 [4020 DN 35]. This provision goes on, in a subsection, to detail the requirement that an audit of 350 Green take place following the closing, and the consequences of various problems that may arise in the course of the audit. *Id*. at § 2.9.1. It says nothing further about Schedule 2.9, nor does it place any restrictions or obligations on 350 Green or its Members with respect to the assets identified there. This is equally true of the provisions referencing the two other schedules CCGI relies on for its claim that the Exchange Agreement "specifically contemplates" the transfer of the Chicago Assets.

In sum, CCGI's argument that the Exchange Agreement—even assuming it was in force at the time 350 Green executed the

12

APA—precluded 350 Green from entering into a valid agreement to sell the Chicago Assets to JNS is without merit.

Nor does the record reflect a genuine dispute that 350 Green and the 350 Members terminated the Exchange Agreement after CCGI failed to deliver its closing documents by the deadline set forth in the agreement, and instead sought to extract additional agreements out of 350 Green and its Members.[6] CCGI spills substantial ink arguing that this putative termination was unlawful because the Exchange Agreement did not contain a "time is of the essence" clause. Therefore, CCGI's argument goes, 350 Green and the 350 Members were not entitled to terminate the agreement without first providing CCGI with notice of default and an opportunity to cure. This argument is unavailing.

Even assuming JNS was required to provide notice and a reasonable opportunity to cure, the uncontroverted evidence is that 350 Green and its Members *did* give CCGI notice, on March 21, 2013, that they would consider the transaction "expired" if it did not close by the deadline. Pierce Aff. ¶ 5, JNS's L.R. 56.1 Stmt., Exh. 6 [4020 DN 35] and n. 1, *supra*. Yet, rather than avoid default by delivering its closing documents (which CCGI now

---

[6] CCGI devotes multiple pages of its opposition brief in the 4020 case to the argument that JNS "lacks standing to argue the Exchange Agreement was terminated." This argument does not withstand scrutiny. JNS does not seek to enforce, or bring any claim of injury based on, the Exchange Agreement. Its arguments about the Exchange Agreement merely respond to CCGI's assertion of that agreement as a basis for invalidating the APA.

insists were executed and ready to go) before the March 22 deadline, CCGI indicated on that date that it *would not* consummate the transaction agreed upon and embodied in the Exchange Agreement. Instead, CCGI told 350 Green and its Members that CCGI's delivery of the closing documents was contingent upon the 350 Members' agreement to the additional terms proposed in CCGI's eleventh-hour non-compete and addendum. *See* 3/22/2013 email of Kylie Wagenet to Craig Sultan et al., JNS's L.R. 56.1 Stmt., Exh 9 at 1 [DN 35] ("[w]e need both documents signed and returned before I will circulate [CCGI's CEO's] signature pages.").

These are not circumstances akin to those in the cases CCGI cites, in which Florida courts have held that "brief delays by one party in performance of a contract" do not discharge the other party of its obligations. *E.g., National Exhibition Co. v. Ball*, 139 So.2d 489, 492 (Fla. App. Ct 1962). At issue here is not merely a "brief delay" in CCGI's performance, but rather CCGI's unmistakable attempt to renegotiate the terms of the parties' deal *after* 350 Green and the 350 Members had performed their closing obligations under the Exchange Agreement. Nothing in CCGI's cited authorities suggests that 350 Green and the 350 Members could not terminate the Exchange Agreement under the circumstances here.

Nor is there merit to CCGI's suggestion that 350 Green and the 350 Members tacitly agreed to extend the closing deadline past March 22, or that they failed to effectuate a valid termination after CCGI's apparent repudiation of the Exchange Agreement, because the parties "continued to negotiate" after the deadline had expired. The very evidence to which CCGI points confirms that at that point, the parties were discussing a different deal. *See, e.g.,* 3/26/13 email of Michael Farkas to Ian Gardner, CCGI's L.R. 56.1 Stmt., Exh. I [4020 DN 37-9 at 1] ("The deal is not off it will just be done a much smarter way"); 3/28/13 email of Kylie Wagenet to Ian Gardner et al., CCGI's L.R. 56.1 Stmt., Exh. J [4020 DN 37-10 at 1] (circulating "Amendment to Equity Exchange Agreement" and "Secured Promissory Note"). Indeed, the transaction that ultimately closed, on April 22, 2013, was, undisputedly, materially different from the one contemplated in the Exchange Agreement.

In short, the undisputed evidence is that 350 Green and the 350 Members considered the Exchange Agreement to have "expired" as of the close of business on March 22, 2013, and CCGI offers no reason—legal or factual—why 350 Green could not enter into a valid agreement to sell the Chicago Assets thereafter.

Equally misguided—even farther afield, in fact—is CCGI's argument that JNS could not validly agree to purchase the Chicago Assets because it knew about the Exchange Agreement and the New

15

York action.   CCGI insists that JNS was not a "good faith purchaser" of the Chicago Assets, and that "for the APA to be valid, JNS Power must have been without actual knowledge of any defect in title or any pending claim."   CCGI's SJ Mem. at 12 [3124 DN 41-2].   Among the numerous flaws in this argument, the most prominent is that CCGI relies exclusively on cases governed by statutes and legal principles not applicable here, and offers neither authority nor reasoned analysis for construing them to invalidate the APA.

In CCGI's first authority, *In re Rock Industries Machinery Corp.*, 572 F.2d 1195 (7th Cir. 1978), the court examined whether a purchaser of a bankrupt's assets at a judicial sale was a "good faith purchaser" pursuant to Bankruptcy Rule 805.   The court's conclusion—which, incidentally, cuts against CCGI's argument in any event, since the court held that the purchaser's knowledge of adverse claims to certain assets "*does not defeat his good faith purchaser status*" (emphasis added)—was firmly rooted in its construction of Bankruptcy Rule 805. *Id.* at 1199.   CCGI's next case, *In re Newton*, 64 B.R. 790 (Bkrtcy. C.D. Il. 1986) also arises under bankruptcy laws, and the portion CCGI cites involves an interpretation Section 349(b) of the Bankruptcy Code.   In *Shacket v. Roger Smith Aircraft Sales, Inc.*, 651 F. Supp. 675 (N.D. Ill. Nov. 20, 1986), the court analyzed the requirements for a good faith purchase under Section 503 of the Uniform

16

Commercial Code, which CCGI admits does not govern the APA. Finally, while it is difficult to distill into just a sentence the factual and legal distinctions between this case and the Supreme Court's hundred-and-twenty year old decision in *Lytle v. Town of Lansing*, 147 U.S. 59 (1893), I need not dwell on the details because CCGI ultimately cites the case merely for its "underlying concept," which, according to CCGI, is "that a party that has knowledge that purchases assets that it knows are the subject of litigation does so at its own risk." CCGI's SJ Mem. at 15 [3124 DN 41-2]. But neither this broad "concept," nor any specific part of the Court's analysis in *Lytle*, supports the conclusion that the APA is void as a matter of law based on JNS's knowledge of the Exchange Agreement and the New York action.[7]

For all of the foregoing reasons, I conclude that the Exchange Agreement is no obstacle to the enforceability of the APA. I now turn to whether the APA is valid on its own terms, and, if so, whether JNS is entitled to its specific performance.

---

[7] The final nail in the coffin of this argument, which really does not merit further discussion, is that because the Exchange Agreement contemplated an "entity sale" and not an "asset sale," as discussed above, the "pending claims" of which JNS had knowledge was not a claim to ownership of 350 Green's *assets* (i.e., the object of the APA) at all, nor did it put JNS on notice of any "defect in [350 Green's] title" to those assets. And even CCGI's indirect ownership of 350 Green's assets (via its ownership of 350 Holdings, which acquired the entity 350 Green when the Amended Exchange Agreement was consummated) was not achieved until April 22, 2013—*after* 350 Green agreed to sell the Chicago Assets to JNS.

The equitable remedy of specific performance is appropriate when the plaintiff can establish 1) the existence of a valid, binding, and enforceable contract; 2) compliance by the plaintiff with the terms of the contract or the fact that plaintiff is ready, willing, and able to comply; and 3) the failure or refusal by the defendant to perform under the contract. *Happy R Securities, LLC v. Agri-Sources, LLC*, 988 N.E. 2d 972, 981 (Ill. App. Ct. 2013). CCGI raises two (or possibly three) arguments in opposition to JNS's motion.

CCGI's first argument merely reiterates that the APA is invalid, and begins by citing the arguments rejected above. CCGI goes on to assert that "JNS has not produced any evidence that the parties to the APA ever executed any documents extending the closing past April 11, 2013." The legal significance CCGI attaches to this assertion is unclear. To the extent CCGI means to argue that no enforceable contract was formed because JNS did not obtain the City of Chicago's acceptance within the period specified by the APA, this argument is unavailing. First, this contingency relates to the performance of the APA, not to its formation. "Whether an act is necessary to formation of the contract or to the performance of an obligation under the contract depends on the facts of the case." *Carollo v. Irwin*, 959 N.E. 2d 77, 84 (Ill. App. Ct. 2011) (quotation marks and citations omitted). Where the intent of the parties, as

18

expressed in the language of the contract, is to form a binding agreement, "agreed-on conditions only affect the duty to perform and the contract is valid." *Id.* In this case, while the transaction contemplated by the APA would not be consummated until the closing contingencies were met, neither party had the privilege of revocation pending the fulfillment of the contingencies, and no further expression of assent by the parties was necessary to proceed with the transaction. In such cases, "it is quite incorrect to say that until the event occurs there is no contract." *McAnelly v. Graves*, 467 N.E. 377, 380 (Ill. Ap. 1984). Accordingly, whether JNS timely fulfilled its closing contingency as specified in the APA relates not to whether an enforceable contract was formed, but to whether it performed under the terms of the contract.

If I construe CCGI's argument as asserting that there is a triable dispute as to whether JNS "complied" with the terms of the APA, however, I conclude that that argument is likewise without merit. While it is true that the APA specified that the closing contingencies be satisfied "on or about April 11, 2013," there is no dispute that parties' agreement was not formed until they executed the APA on April 17, 2013. I agree with JNS that the most likely interpretation is that the April 11 date was a scrivener's error, as the parties could not have intended to specify a closing date that was before the formation of their

19

agreement. But even taking the April 11 date at face value, the evidence is uncontroverted that JNS obtained the City of Chicago's acceptance on April 30, 2013. CCGI has offered no basis for concluding that JNS did not satisfy its closing contingencies within the period contemplated by the APA's express terms: "on or around April 11." In any event, the authorities cited by both parties acknowledge that specific performance may be appropriate when the party seeking it has shown either "compliance" with its contractual obligations, "or the fact that [it] is ready, willing and able to perform [its] part of the contract." *Happy R Securities*, 988 N.E. 2d at 981 (citing *McCormick Road Associates L.P. II v. Taub*, 659 N.E. 2d 52 (Ill. App. Ct. 1995). There is no dispute that JNS obtained the requisite acceptance from the City of Chicago on April 30, 2013. At this juncture, JNS has done all that was required of it under the APA.[8]

CCGI's final argument is that JNS is not entitled to specific performance because 350 Green's breach of the APA can be redressed by money damages. In Illinois, specific performance of a contract is an extraordinary remedy that is not available as a

---

[8] CCGI also argues that "there is also a genuine issue of fact as to whether the hosts that needed to provide their consent for license agreements pursuant to part (b) of the APA ever provided such consents." As best I can understand this statement (there is no "part (b)" of the APA), it appears to pertain to closing contingencies that 350 Green was required to fulfill. There is no dispute, however, that 350 Green failed to perform under the APA. Its failure to do so is precisely why JNS seeks specific performance.

matter of right. *Rothner v. Mermelstein*, 579 N.E.2d 1022, 1026 (Ill. App. Ct. 1991). Nevertheless, I may, in my discretion, grant specific performance as an equitable remedy when money damages are inadequate. Specific performance is appropriate, for example, when the contract that was breached contemplates the sale of unique assets. *Chariot Holdings, Ltd. v. Eastmet Corp.*, 505 N.E. 2d 1076, 1085 (Ill. App. Ct. 1987) ("The object of courts of equity is to enforce rather than to evade contracts and our courts have repeatedly held that courts of equity will enforce a valid contract for the sale of unique assets as a matter of right."). The undisputed record in this case establishes that the Chicago Assets are unique.

The APA assigned to JNS all of 350 Green's rights in the Chicago Project, which includes the electric chargers (both those that are already installed and those that have been purchased with grant funds but are not yet installed), as well as 350 Green's interests in leases, licenses, and agreements with the hosts for the chargers. Both the chargers and the agreements relating to them are unique, as they are, undisputedly, integral to the completion of the Chicago Project. *See In re Bullet Jet Charter, Inc.*, 177 B.R. 593 (Bkrtcy. N.D. Ill. 1995) (aircraft on which work had been performed to meet contractual requirements was unique under "totality of circumstances" test). CCGI argues that the assets are not unique because the City of Chicago has

not assigned the Chicago Project grant to either JNS or CCGI. I fail to see the logic of this argument, however, because regardless of which party is ultimately assigned the grant, there is no genuine dispute that only the party that owns Chicago Assets can complete the Chicago Project.

III.

For the reasons explained above, JNS's motion for summary judgment ordering specific performance of the APA is granted. CCGI's motion for summary judgment declaring the APA void is denied.

**ENTER ORDER:**

_Elaine E. Bucklo_
Elaine E. Bucklo
United States District Judge

Dated: September 24, 2013